UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSEPH PALMER,                    :

    Plaintiff,                    :

V.                               :   CASE NO. 3:06-CV-795 (RNC)

RUSSELL GARUTI, et al.,           :

    Defendants.                   :

<u>RULING AND ORDER</u>

Plaintiff brings this action under 42 U.S.C. § 1983 against
employees of the Newington Volunteer Ambulance Corps ("NVAC") and
New Britain General Hospital ("the Hospital").  He claims that
they violated his rights under federal and state law in
connection with his involuntary detention for medical treatment
after he was taken into protective custody by a Newington police
officer on the ground that he appeared to be incapacitated by
alcohol.  The defendants have moved for summary judgment.  They
contend that the plaintiff cannot recover on his § 1983 claims
because he cannot prove that they acted under color of state law
and a jury would be bound to find that they acted in good faith.
I conclude that a jury could find that the ambulance defendants
acted under color of state law, but not the hospital defendants.
I also conclude that a jury would have to find that the ambulance
defendants acted in good faith reliance on the apparently lawful
order of the Newington police officer who made the decision to
take the plaintiff into protective custody and called upon NVAC
to take him to the Hospital.  Accordingly, summary judgment is

granted to the defendants on the §1983 claims.  I decline to exercise supplemental jurisdiction over the other claims, which are dismissed without prejudice.[1]

I.   Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Defendants have the initial burden of showing that there is an absence of evidence to support the plaintiff's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  To avoid summary judgment, the plaintiff must point to evidence that would permit a jury to find in his favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In determining whether this standard is met, the evidence must be viewed in a manner most favorable to him.  Id. at 255.

II.  Background

A.   The Protective Custody Statute

Connecticut's protective custody statute prescribes how police should handle individuals who appear to be intoxicated or incapacitated by alcohol.  Conn. Gen. Stat. § 17a-683.  When a

---

[1] Defendants have moved to dismiss the complaint for failure to prosecute under Rule 41(b). Dismissal under Rule 41(b) is a "harsh remedy" that should be used only in "extreme situations." See LeSane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 209 (2d Cir. 2001).  Defendants have not shown that this case presents such an unusual situation.  Accordingly, the motions to dismiss are denied.

police officer encounters a person who is intoxicated, the officer may help the person home or to a treatment facility, but only if the person consents.  Id. § 17a-683(a).  In contrast, when an officer encounters a person who "appears to be incapacitated by alcohol," the officer must take the person into protective custody and have him brought to a treatment facility or hospital.  Id. § 17a-683(b).  A person is incapacitated by alcohol if "his judgment is so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment."  Id. § 17a-680.

The statute provides that any person brought to a hospital pursuant to § 17a-683(b) "shall be examined by a medical officer or his designee as soon as possible" to determine whether the person requires treatment.  Id. § 17a-683(c).  The medical officer "shall determine whether the person requires treatment based upon the medical examination of the person and upon a finding that the person is incapacitated by alcohol."  Id.  If the medical officer determines that treatment is required, the person "shall be admitted to, referred to or detained at a hospital for necessary treatment."  Id. § 17a-683(d)(1).  The person must be released "once he is no longer incapacitated by alcohol or within forty-eight hours, whichever is shorter, unless he consents to further medical evaluation or treatment."  Id. § 17a-683(e).

B.   Facts

The record, viewed favorably to the plaintiff, shows the following.  In 2003, when the plaintiff was twenty-one, he went to a nightclub in Newington, where he drank one beer and two "Red Death" cocktails.  When the club closed at 2:00 a.m., he walked to his car.  He did not intend to drive because he realized he was too intoxicated.  As he was unlocking his car door, he heard a bouncer yell, "Hey, stop that kid," and saw the bouncer running toward him.  He got into his car and locked the door.  The bouncer knocked on the window and told him to get out of the car. Plaintiff shook his head no and ducked down in the seat.  The club called the Newington Police Department.

A Newington police officer soon arrived and ordered the plaintiff to get out of the car.  He eventually got out and told the officer that he had consumed three drinks.  The officer asked if the plaintiff knew anyone who could give him a ride home and the plaintiff said no.  The officer decided to take the plaintiff into protective custody pursuant to § 17a-683(b) and have an ambulance transport him to a hospital.[2]

NVAC dispatched an ambulance to the scene.  Plaintiff protested that he did not want to go to a hospital but he got

---

[2]   The officer's report, completed at the time, states that the plaintiff was "passed out" in his vehicle, smelled of alcohol, was unsteady on his feet and unaware of his whereabouts, began crying "uncontrollably" and had no one to care for him.

4

into the ambulance without resisting.  The ambulance personnel received from the officer a "CGS 17a-683(b) protective custody form" (also known as an "emergency involuntary committal form"), which documented the officer's finding that the plaintiff was incapacitated by alcohol and needed to be transported to a medical facility.  The Newington police had no further involvement in the events that night.

Defendants Moquin and Garuti, emergency medical technicians with NVAC, secured the plaintiff to a stretcher inside the ambulance and transported him to New Britain General.  During the six minute trip, plaintiff refused to allow Moquin to take his vital signs.  He also continued to protest that he did not want to go to a hospital.  Moquin documented her initial clinical impression that the plaintiff appeared to be intoxicated.  She also noted that he appeared to be "alert."  The ambulance arrived at the Hospital at 2:36 a.m.

Defendant Carrie Kranz, a nurse in the emergency department, performed a triage assessment.  She learned that the plaintiff had been sent to the Hospital by the Newington Police Department, that he was found asleep in his car and that he admitted having three drinks.  Kranz asked him to change into a hospital gown. After he initially refused, she requested security assistance. Defendants Coscina and Colter, NBGH security officers, responded. When the plaintiff became aware that security officers were

5

present, he changed into a cloth hospital gown that tied in the back and hung to his knees.  His clothing, shoes, keys, cellular telephone and wallet were placed in a safe.

Around 3:10 a.m., plaintiff permitted Kranz to draw a blood sample to test for the presence of alcohol.  He understood that Coscina and Colter could use force to obtain a sample if he refused to cooperate.  The results of the test later showed that his blood alcohol level was 0.12%, above Connecticut's 0.08% limit for driving.  See Conn. Gen. Stat. § 14-227a.  After the blood sample was drawn, Coscina and Colter left to resume their normal duties.  Kranz's nursing diagnosis was "ineffective coping related to alcohol ingestion."

Before being informed of the results of the medical evaluation, plaintiff became "agitated" and fled the hospital wearing only the hospital gown.  He left without his clothes, shoes, telephone, wallet and car keys.  Never having been to New Britain before, he had "no idea where [he] was going."  Kranz notified NBGH security personnel.  Defendants Zukowski, Colter and Holleran followed the plaintiff.  He ran into a park, developed a leg cramp, stopped and sat on the ground to stretch. When the security officers arrived, he jumped up but the officers told him to "freeze and get down on the ground."  He was handcuffed and transported back to the hospital in an ambulance.

When plaintiff was once more safely inside the hospital, the

handcuffs were removed.  He was "livid" and yelled obscenities.
He was eventually restrained for approximately one hour and
fifteen minutes using leather restraints on his right wrist and
left ankle.  While restrained, he persisted in yelling
obscenities and demanding to be released even when no hospital
personnel were in the room.

At 4:00 a.m., physician assistant Steven Conlin examined the
plaintiff.  He reviewed the results of the blood test and made a
diagnosis of ethanol intoxication.  Dr. John Sottile, an
emergency department physician, reviewed and approved Conlin's
entries in the medical record.  Around 5:00 a.m., plaintiff's
possessions were returned to him.  At 5:15, he was discharged
with instructions to avoid heavy alcohol use.

III. <u>Discussion</u>

A.   <u>State Action</u>

To prevail in an action under 42 U.S.C. § 1983, a plaintiff
must show both that the defendant deprived him of a federal right
and that, in doing so, the defendant acted "under color of state
law."  In essence, a plaintiff must prove that the alleged
deprivation is "fairly attributable" to the state.  <u>Rendell-Baker</u>
<u>v. Kohn</u>, 457 U.S. 830, 838 (1982); <u>Lugar v. Edmondson Oil Co.</u>,
457 U.S. 922, 937 (1982)).

1. <u>Ambulance Defendants</u>

Plaintiff contends that the conduct of the ambulance

7

defendants was compelled by the Town of Newington and is therefore actionable under § 1983.  See Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (finding of state action appropriate "when it can be said that the State is responsible for the specific conduct of which the plaintiff complains").  I agree.  NVAC provides ambulance service to the Town pursuant to a contract.  (Amb. Defs.' Rule 56(a)1 Statement ¶ 24; Pl.'s Rule 56(a)2 Statement ¶ 24.)  The contract provides in relevant part that NVAC must provide ambulance service "whenever . . . any duly authorized Newington police officer in the performance of his duty deems that emergency ambulance service is required by an individual . . . within the limits of the Town . . .."  (Amb. Defs.' Mem. Supp. Summ. J. Ex. A ¶ 2.A.)  Citing this provision, the ambulance defendants themselves insist that they were "obligated to provide emergency medical services when requested" and "had no authority to challenge the plaintiff's committal and transport."  (Id. at 10, 11.)  Because the contract required the ambulance defendants to engage in the specific conduct complained of, a jury could reasonably find that they acted "under color of state law."

> 2.  Hospital Defendants

Plaintiff contends that the conduct of the hospital defendants was compelled by the State by virtue of the provisions of the protective custody statute quoted earlier.  I disagree.

8

The statute required that a medical officer determine whether the plaintiff needed treatment, but it did not mandate his continued detention or prescribe the standards to apply in determining whether detention and treatment were necessary.  Because the hospital defendants retained their customary professional discretion, a jury could not reasonably find that their specific conduct was compelled by the state.  See Blum, 457 U.S. at 1008 (no state action found because the specific conduct complained of "ultimately turn[ed] on medical judgment made by private parties according to professional standards that are not established by the State").

     Plaintiff observes that the protective custody statute uses mandatory language in describing the obligations of medical personnel.  But whether a statute is compulsory for state-action purposes is to be determined with reference to the overall statutory scheme.  See Okunieff v. Rosenberg, 166 F.3d 507 (2d Cir. 1999) (adopting opinion of Okunieff v. Rosenberg, 996 F. Supp. 343 (S.D.N.Y. 1998)).  In Okunieff, the plaintiff was involuntarily committed to psychiatric care under New York's Mental Hygiene Law.  The District Court found no state action because the State's involuntary commitment scheme as a whole left "[t]he actual decision of whether commitment is warranted . . . entirely to the sound medical judgment of physicians."  996 F. Supp. at 352.

9

Plaintiff notes that the statutory provisions at issue in Okunieff did not employ the same compulsory language found in the protective custody statute.  As the Okunieff court observed, however, other "[c]ourts have . . . found state compulsion lacking despite the existence of coercive language in statutes comparable to the MHL." Id. at 349 n. 2 (citing S.P. v. City of Takoma Park, MD, 134 F.3d 260, 269 (4ᵗʰ Cir. 1998); Janickso v. Pellman, 774 F. Supp. 331, 338 (M.D. Pa. 1991), aff'd, 970 F.2d 899 (3d Cir. 1992)).

In S.P., the Fourth Circuit held that Maryland's involuntary commitment statute was not compulsory for state-action purposes, despite its compulsory language.[3]  The Court concluded that the private defendants were not state actors under the state compulsion test because "the statutory scheme, when viewed as a whole, is more permissive than mandatory, and . . . it grants private physicians complete medical discretion in determining whether an individual should be involuntarily committed." Id. at 268.

Janickso involved Pennsylvania's involuntary commitment statute, which employs similar language to that found in the

_____

[3]Maryland's involuntary commitment statute states that "[i]f an emergency evaluee meets the requirements for involuntary admission and is unable or unwilling to agree to a voluntary admission . . ., the examining physician shall take the steps needed for involuntary admission." S.P., 134 F.3d at 269 (quoting Md. Code Ann., Health-Gen. § 10-625(a) (1994)).

protective custody statute.[4]  The Court acknowledged that the
Pennsylvania statute "in fact, uses language which suggests a
degree of coercion," but concluded that "the 'shalls' of [the
statute] relating to the necessity of emergency treatment appear
to be in place more for the protection of the person to be
committed than to compel that person's commitment by private
actors."  774 F. Supp. at 338.  Thus, the actions of the private
defendants taken pursuant to the statute were not "compelled by
or sufficiently connected to state directives to attribute those
actions to the state."  Id. at 339.

        The legislative history of the protective custody statute
supports the view that it entrusts medical personnel with
significant discretion.  The statute was revised several times,
on each occasion granting more discretion to doctors.  An early
version of the statute stated, "[t]he medical officer may take a
blood sample, administer a breath test, take a urine sample or
conduct any other test to determine the amount of alcohol in the
bloodstream of the person."  See P.A. 74-280, 1974 Conn. Acts 681
(1974).  It was quickly revised to state that the medical officer
"may employ any diagnostic or therapeutic procedures reasonably

_____

        [4]"Section 302(b) of the [Pennsylvania statute] states [that]
the person taken to the facility 'shall be examined by a
physician within two hours of arrival' and that the physician
'shall' begin treatment immediately if it is determined that the
person is 'severely mentally disabled.'"  Janickso, 774 F. Supp.
at 338 (emphases in original).

necessary to restore the person to a state of being no longer incapacitated by alcohol," P.A. 75-569, 1975 Conn. Acts 830 (1975), and subsequently revised again to eliminate references to diagnostic procedures altogether.  See P.A. 90-209, 1990 Conn. Legis. Serv. 390 (West 1990).  As this history demonstrates, although the intent of the statute is to ensure that a patient receives some form of medical examination, the legislature wants "doctors . . . to make the examination the way they feel [is] most appropriate."  33 H.R. Proc., Pt. 18, 1990 Sess., p. 6242.

Plaintiff relies on the Second Circuit's decision in Kia P. v. McIntyre, 235 F.3d 749 (2d Cir. 2000).  In that case, a mother alleged that a private hospital acted under color of state law when it detained her newborn child, who had tested positive for methadone upon birth, while it awaited a determination from the New York City Child Welfare Administration whether the infant should be released to the mother's custody.  Id. at 751.  The Court held that, for the period of time during which the child was kept for necessary medical care, the hospital was not a state actor.  Id. at 756-57.  But for the subsequent period the hospital was a state actor.  Id. at 757.

Unlike the defendant in Kia P., the hospital defendants did not detain the plaintiff solely at the request of the State. They detained him, at least in part, if not solely, for treatment purposes.  In fact, the hospital defendants urge that his

apparent need for care and treatment obliged them to detain and
treat him independent of any requirement of the protective
custody statute.  <u>See</u>, <u>e.g.</u>, <u>Hawthorne v. Blythewood</u>, 118 Conn.
617, 174 A. 81, 84 (Conn. 1934) ("[W]hen a patient enters a
hospital maintained for private profit, he is entitled to such
reasonable attention as his safety may require; and if he is
temporarily bereft of reason and is known by the hospital
authorities to be in danger of self-destruction, the authorities
are in duty bound to use reasonable care to prevent such an
act.").

Because the evidence does not support a finding that the
hospital defendants acted under color of state law, they are
entitled to summary judgment on the § 1983 claims.[5]  Having
previously concluded that the plaintiff can prove that the
ambulance defendants acted under color of state law, I now turn
to their remaining arguments in favor of summary judgment.

B.   <u>Good Faith Defense</u>

The ambulance defendants argue that they should be immune
from liability because they acted in an objectively reasonable

---

[5]  Plaintiff asserts that the hospital defendants conspired
with the Newington police officer to violate his rights, and
therefore acted under color of state law for purposes of § 1983,
but he offers no evidence to support a finding that there was
such a conspiracy.

manner.[6]  Qualified immunity is not available to a private

defendant sued under § 1983 unless it is firmly rooted in common

law and supported by strong policy reasons.  See Richardson v.

McKnight, 521 U.S. 399, 403 (1997); Wyatt v. Cole, 504 U.S. 158,

168-69 (1992).[7]  The ambulance defendants make no argument that

there is a firmly rooted tradition of extending immunity to

defendants in their position or that the policy goals underlying

the doctrine of qualified immunity are served by applying it

here.  Therefore, they are not entitled to qualified immunity.

I conclude, however, that they are entitled to assert an

affirmative defense of good faith and that this defense entitles

them to judgment as a matter of law.

---

[6]Defendants also argue that they are immune from suit
pursuant to Conn. Gen. Stat. § 17a-689, which states that "[a]ny
medical officer or staff member of a treatment facility or
hospital acting in compliance with sections . . . 17a-680 to 17a-
690 inclusive, shall be deemed to be acting in the course of his
official duty and shall not be criminally or civilly liable
therefor."  But "[c]onduct by persons acting under color of state
law which is wrongful under 42 U.S.C. § 1983 . . . cannot be
immunized by state law."  Martinez v. California, 444 U.S. 277,
284 n. 8 (1980).  Section 17a-689 thus provides no shield to the
defendants against liability under § 1983.

[7]Some courts of appeals have indicated that qualified
immunity is simply not available to private defendants.  See
Jordan v. Rothschild, 20 F.3d 1250, 1276 (3d Cir. 1994) ("The
availability of qualified immunity to private persons who act
under color of law is no longer an open question. It is settled.
Private persons cannot assert it."); Burrell v. Bd. of Trustees
of Ga. Military Coll., 970 F.2d 785, 794-95 (11th Cir. 1992)
("although the Court [in Wyatt] did not explicitly overrule
decisions holding that qualified immunity is available to private
defendants in other circumstances, the Court's analysis does not
bode well for the continued vitality of these decisions.").

14

In Wyatt, the Court noted that private defendants may be able to avoid § 1983 liability based on an affirmative defense that they acted in good faith.  504 U.S. at 169.  Likewise, in Richardson, the Court expressly left open the question whether a private defendant in a case under § 1983 "might assert, not immunity, but a special 'good-faith' defense."  521 U.S. at 413. Since then, every Circuit Court to directly address this question has answered it in the affirmative.  See Wyatt v. Cole, 994 F.2d 1113, 1120 (5th Cir. 1993) (on remand from Supreme Court); Jordan v. Rothschild, 20 F.3d 1250, 1277 (3d Cir. 1994); Vector Research, Inc. v. Howard Attorneys, P.C., 76 F.3d 692, 699 (6th Cir. 1996); Pinsky v. Duncan, 79 F.3d 306, 311 (2d Cir. 1996); Clement v. City of Glendale, 518 F.3d 1090, 1097 (9th Cir. 2008). Though Wyatt and some of its progeny arose in the attachment context, at least two courts have held that good faith is recognized as a defense to claims of illegal search or seizure. See Vector Research, 76 F.3d at 699 (private attorneys who conducted a search and seizure of plaintiffs' property pursuant to a court order retained a good faith defense to Bivens claim); Clement, 518 F.3d at 1097 (9th Cir. 2008) (good faith defense available to private tow-truck operator who seized plaintiff's car pursuant to erroneous instruction of police officer).

Whereas qualified immunity protects public officers from the burdens of litigation regardless of their subjective culpability,

15

good faith is a normative defense clothed in principles of fault.
See generally, Sheldon Nahmod, The Emerging Section 1983 Private
Party Defense, 26 Cardozo L. Rev. 81, 90-94 (2004).  As one court
has explained, the rationale for a good faith defense is that
private actors should not be held liable for relying on the
apparently legitimate directions of public officers, especially
those who are themselves entitled to assert qualified immunity:

> It would be manifestly unfair to hold that
> the state actor – whose participation is
> required for there to be a section 1983
> violation at all – is entitled to qualified
> immunity, but hold the private actor, who did
> not subjectively believe that he was acting
> unconstitutionally, liable for the
> plaintiff's damages.

Franklin v. Fox, No. C 97-2443 CRB, 2001 WL 114438, at *5 (N.D.
Cal. Jan. 22, 2001).

Because the good faith defense is concerned with fault, it
necessarily entails a subjective element.  In this respect, the
analysis resembles the qualified immunity analysis before it was
reformed in Harlow v. Fitzgerald, 457 U.S. 800 (1982).  Nahmod,
26 Cardozo L. Rev. at 91.  In Wood v. Strickland, a pre-Harlow
case, the Supreme Court held that qualified immunity contained
both subjective and objective elements.  420 U.S. 308, 321
(1975).  Similarly, the good faith defense contains both
elements.  The private party must subjectively believe that he is
acting according to lawful instructions from a public officer,

16

and that belief must be objectively reasonable.[8]

Like qualified immunity, good faith is properly treated as an affirmative defense, to be raised by the defendant and proven by a preponderance of the evidence.  See Clement, 518 F.3d at 1097 (concluding that private defendants were entitled to "*assert . . . a good faith defense*") (emphasis added); Tarantino v. Syputo, No. C 03-03450 MHP, 2006 WL 1530030, at *10 (N.D. Cal. 2006) ("[B]ecause good faith is an affirmative defense to liability, . . . defendant bears the burden of proof."), aff'd 270 F. App'x 675, 677 (2008) (noting that district court "correctly determined that the private towing companies are entitled to invoke a good faith defense").  However, because good faith is a defense to liability rather than an immunity from suit, an assertion of good faith does not bring a lawsuit to a halt.  Discovery is not suspended while the court considers a dispositive motion based on good faith and a defendant whose dispositive motion is denied cannot take an interlocutory appeal.

Given these contours, the good faith defense squarely applies to the ambulance defendants in this case.[9]  It is

---

[8]  Because it contains a subjective element, good faith is an issue of fact typically to be decided by the jury.  However, if no reasonable jury could conclude that a defendant did not act in good faith, then a court may properly grant summary judgment.

[9]  Plaintiff argues that the ambulance defendants should not benefit from the good faith defense because they did not raise it in their responsive pleading as required by Rule 8(c).
(continued...)

undisputed that when the ambulance defendants responded to the
officer's call, he gave them a "CGS 17a-683(b) protective custody
form" documenting his finding that the plaintiff was
incapacitated by alcohol and needed to be transported to a
medical facility.  It is beyond dispute that they subjectively
believed they were required to comply with the officer's order.
This belief was objectively reasonable.  The Second Circuit has
held that "[a]bsent significant indications to the contrary, a
[police] officer is entitled to rely on his fellow officer's
determination that an arrest was lawful."  Loria v. Gorman, 306
F.3d 1271, 1288 (2002).  It is no stretch to hold, in this
related context, that an emergency medical technician is entitled
to rely on a police officer's determination that an individual is
"incapacitated by alcohol" unless there are significant
indications to the contrary.  The ambulance defendants had no

---

[9](...continued)
Throughout the initial pleadings in this case, both sides assumed
that qualified immunity was at least categorically available.  In
advance of oral argument, the parties were asked to address
whether the ambulance defendants "are entitled to a good faith
defense."  Both parties proceeded to brief the issue and address
it in oral argument.  Because plaintiff was given ample notice of
the potential applicability of the defense and an opportunity to
rebut it, he suffered no prejudice from its belated assertion.
See Astor Holdings, Inc. v. Roski, 325 F. Supp. 2d 251, 260
(S.D.N.Y. 2003) ("[A] district court may consider the merits of
an affirmative defense . . . raised for the first time at the
summary judgment stage, so long as the plaintiff has had an
opportunity to respond.") (citing Curry v. City of Syracuse, 316
F.3d 324, 330-31 (2d Cir. 2003) (allowing affirmative defense to
be raised for the first time in reply memorandum after being
addressed sua sponte by district court).

reason to doubt the validity of the officer's decision. Therefore, their good faith reliance was objectively reasonable. No reasonable jury could find otherwise.  Therefore, the ambulance defendants are entitled to summary judgment on the § 1983 claims.

     C.   <u>State Law Claims</u>

Having decided that the federal claims must be dismissed, I decline to exercise supplemental jurisdiction over the state law claims. <u>See</u> <u>Kolari v. New York-Presbyterian Hosp</u>., 455 F.3d 118, 122 (2d Cir. 2006).

IV.  <u>Conclusion</u>

For the foregoing reasons, defendants' motions for summary judgment are granted with regard to the § 1983 claims, which are dismissed with prejudice, and the state law claims are dismissed without prejudice.  The Clerk may close the file.

So ordered this 17th day of February 2009.


                    <u>/s/ RNC</u>
                    Robert N. Chatigny
              United States District Judge